UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 8:20-cr-292-VMC-CPT

JORDAN PULIDO
_____/

### SENTENCING MEMORANDUM

Jordan Pulido was a sexually inexperienced undiagnosed autistic when he struck up a relationship with a girl who showed him attention online. This relationship advanced under the tutelage, direction, and encouragement of his overbearing father until, according the jury's verdict, it became sexual. In the Defense's view, the Guidelines call for a sentencing range of 210-262 months' imprisonment. But part of that Guideline range comes from the fact that Mr. Pulido used a computer. In this day and age that specific offense characteristic has become an absurdity, as one uses a computer to do nearly everything. This Court should vary downward to eliminate any additional punishment for using this now-ubiquitous device. Further, the influence of Mr. Pulido's father, his autism, and the sentences handed down by this Court in similar cases support a sentence below the Guidelines range. Accordingly, this Court should sentence Mr. Pulido to 168 months' imprisonment.

## I. The use-of-a-computer enhancement is unwarranted.

Imagine committing this crime *without* using a computer. The facts of the case will be familiar to the Court. Mr. Pulido has been found guilty of committing crimes in *foreign* commerce against a Croatian minor, IG. The Government's evidence presented a theory whereby Mr. Pulido met IG in the social media application YouNow and began a lengthy online relationship with her that was first friendly, then romantic, and finally sexual. Mr. Pulido traveled to Croatia, and his father arranged for IG and her family to travel to Florida.

All of this involved the use of the internet, as any such activity must have in 2018. There is no way to commit such a crime without using a computer. Mr. Pulido's very occasion for meeting IG was online. At first, the entirety of his relationship with IG, who lived in Croatia, was online. One struggles to conjure up a scenario in which this crime could be committed without the internet. Perhaps one could join a mailing list and send letters at random, wishing to fall hopelessly in love through the postal service, and pay cash for plane flights. But in 2018 this is fanciful.

The use-of-a-computer enhancement is a specific offense characteristic, designed to separate offenses in the heartland from more serious offenses. Without elaboration, the Sentencing Commission described the use of a computer as "aggravating" in promulgating this enhancement. U.S.S.G. app. C, vol. III 61 (Amendment 664). But the Commission's own data confirm what common sense

already provides. Ninety percent of cases sentenced under the Guideline and base offense level applicable to Mr. Pulido's offenses included the use-of-a-computer enhancement from Fiscal Years 2016-2020.[1] Virtually everyone who commits these offenses does so by using a computer. And, unlike with other computer-based enhancements, there is no evidence that the Commission adjusted the base offense level downwardly in recognition of the fact that this specific offense characteristic will almost always be applied. *Cf. United States v. Walters*, 775 F.3d 778, 786-77 (6th Cir. 2015). Instead, what is supposed to be "aggravating" is "all but inherent to the crime of conviction." *Cf. United States v. Jenkins*, 854 F.3d 181, 188 (2d Cir. 2017).

Of course, this Court is not bound to apply an unjustified advisory sentencing enhancement. *See Kimbrough v. United States*, 552 U.S. 85, 109-110 (2007). The use-of-a-computer enhancement bears no relation to any 18 U.S.C. § 3553(a) factor. Mr. Pulido should be punished for enticing a minor in Croatia, but he should not be punished more severely for using the internet to do so. This Court should therefore vary downward two levels to neutralize it.

---

[1] Data available at https://www.ussc.gov/research/datafiles/commission-datafiles.

## II. The nature of the offense and the defendant's history and circumstances: a child-like autistic under the influence of his father.

Jordan always had trouble focusing, feeling that his mind wandered into daydreams. He was held back in first and second grades. When he experienced bullying at school, his father, Roberto, pulled him out and homeschooled him. Then, Roberto pulled *all* of Jordan's five brothers out of school and homeschooled them. At home, Roberto was the patriarch presiding over the education, upbringing, and employment of his six sons. But Jordan never advanced past the program for high school, and never obtained a GED. While he struggled with many tasks, he found he was a bit of a savant in music. He could hear a song once and play it on the guitar. An adult lacking social skills, at home with his adult brothers and his father, he took to the internet, where he could meet "friends" across the world and broadcast his music.

***

While Jordan and his family always wondered if he was autistic, he was never formally evaluated until after defense counsel was appointed. Dr. Valerie McClain evaluated Jordan, performing the Gilliam Autism Rating Scale – 3 (GARS-3). The GARS-3 assesses difficulties in six areas, and Jordan showed difficulty in all six areas. These included:

- if left alone, the majority of his behavior will be spent in repetitive or stereotyped behaviors;

- is preoccupied with specific stimuli that are abnormal in intensity;
- stares at hands, objects, or items in the environment for at least five seconds;
- makes rapid, lunging, darting movements when moving from place to place;
- shows unusual interest in sensory aspects of play materials, body parts, or objects;
- displays ritualistic or compulsive behaviors; he pays little attention to what peers are doing; he seems indifferent to others' attention; he shows minimal expressed pleasure when interacting with others;
- shows minimal or no response when others attempt to interact with him;
- displays little or no reciprocal communication;
- has difficulty understanding what causes people to dislike him;
- fails to predict possible outcomes of social events;
- does not seem to understand that another person does not know something;
- becomes frustrated quickly when he cannot do something;
- responds negatively when given commands, requests, or direction;
- throws temper tantrums when he does not get his way;
- throws temper tantrums when told to stop doing something he enjoys doing;
- talks about a single subject excessively;
- shows superior knowledge or skill in specific subjects (i.e., music);
- shows intense, obsessive interest in specific intellectual subjects;

- makes naïve remarks;

- repeats (or echoes) words or phrases verbally or with signs;

- repeats words out of context; and

- speech is abnormal in tone, volume, or rate.

    The probation officer noted similar observations of Jordan in the presentence report. Dr. McClain diagnoses Autism Spectrum Disorder.

    Indirectly, Jordan's undiagnosed autism probably led to his post-traumatic stress disorder. Research indicates autistic children are disproportionately likely to be bullied in school. "Many people with autism have trouble recognizing social cues, which makes them awkward around others. They also often engage in repetitive behaviors and then to be hypersensitive to environmental stimuli, all of which makes kids with the disorder ripe targets for bullies who home in on difference and enjoy aggravating their victims." Autistic children like Jordan who are relatively high functioning are even more vulnerable, because they are capable of interacting with peers and can speak, making their disability less visible and more difficult for peers to understand.[2] Consistent with this research, Jordan recalls severe incidents of bullying, such as being attacked by peers. As a result, Dr. McClain diagnoses PTSD.

---

[2] *See* Maia Szlalavitz, "Why autistic kids make easy targets for school bullies," *CNN* (Sep. 7, 2012), https://www.cnn.com/2012/09/07/health/autistic-kids-bullied-time/index.html.

More importantly, research also indicates that autistic people are more susceptible to the requests, demands, and influence of others. With increased levels of anxiety and lower levels of self-esteem from bullying, autistic people show heightened compliance levels, "the tendency to agree with or carry out the requests and demands of others."[3]

Again, this research is borne out in Jordan's case. And no one exercised more influence over Jordan's life than one person: his father and co-defendant, Roberto Jimenez.

***

The scene set for the instant offense was therefore as follows: Jordan was grown-up but socially isolated and uneducated, having been withdrawn from school by Roberto because of his undiagnosed autism for homeschooling, though Roberto never actually finished the homeschooling. Roberto was Jordan's leader and employer, having secured janitorial employment for Jordan and his brothers, who also lived at home (with the exception of the oldest, who married and moved out). In these circumstances, IG reached out to Jordan online, admiring his guitar playing.

---

[3] Chandler RJ, Russell A, Maras KL. Compliance in autism: Self-report in action. *Autism*. 2019;23(4):1005-1017.

When the girl seemed to show romantic interest, Jordan did what he always did, seek the advice of his father.

Most fathers would have an obvious response to a 23-year-old son considering pursuing a romantic relationship with a 14-year-old girl in Croatia. According to the Government's theory, Roberto's response was criminal. He not only affirmatively encouraged his son in the relationship, he actively assisted at every step. He advised Jordan on how to engage in mutual masturbation with IG online; he falsely held himself out as a doctor, and gave IG some highly questionable fertility advice so that Jordan could continue to have sex with her; he befriended IG's mother to build trust in her; he bankrolled and planned IG's family's trip to Florida; he orchestrated the ruse whereby Jordan and IG "missed" the flight back to Croatia, and then convinced IG's mother to leave her daughter in a foreign country on the false promise that he would fly her back as soon as she was found; he brought IG to an immigration lawyer in an effort to keep her in the United States legally; he exercised complete control over IG's communications with her mother in Croatia; and he sent Jordan to his uncles in Mexico to avoid arrest, and falsely denied the offense to the police.

Under these circumstances, a 168-month sentence satisfies the 18 U.S.C. § 3553(a) factors, and a sentence any longer would be greater than necessary. A fourteen-year sentence will vindicate the harm done to the victim and fundamentally change the course of Jordan's life at a young age. With no previous criminal history

8

whatsoever, he will emerge from prison a registered sex offender. Just as he was bullied in school because of his autism, he has been bullied while in pretrial detention in this case. He can expect 14 years of this sort of treatment if the Court adopts his requested sentence. This is no slap on the wrist, and it would promote respect for the law, reflect the seriousness of the offense, and send a strong deterrent message to Jordan and society in general.

In particular, a longer sentence is unnecessary to protect the public from future crimes committed by Jordan. Jordan is not a pedophile. He has no prior criminal history. This is not a case, like some others, where a very lengthy sentence might be justified by a need to prevent a predator from harming a new minor victim. Rather, this is a case in which a socially isolated, undiagnosed autistic found himself the object of a girl's attention online, and then too easily fell under the malevolent influence of his father. The 168-month sentence requested for Jordan in combination with the sentence this Court imposes on his father will likely separate Jordan from his father's influence forever. The conditions that led to Jordan's commission of the instant offense will not be repeated. A 168-month sentence therefore satisfies the § 3553(a) factors without being excessive.

### III. The need to avoid unwarranted sentencing disparities.

At least two cases in which this Court was the sentencing judge should guide this Court's application of § 3553(a)(6). Because the Federal Defender represented

9

both defendants and owes a duty of confidentiality to them, and because of restrictions on the dissemination of information within presentence reports, the defendants' names are masked below. The Defense will provide the case numbers under seal.

Mr. H.

Like Mr. Pulido, Mr. H met his victim online. She lied about her age (17), although Mr. H eventually learned it. Mr. H was 39 at the time. The two struck up an online relationship that centered around "bondage and discipline, dominance and submission, and sadism and masochism," collectively, BDSM. The relationship was carefully consensual, with detailed discussion of what acts the pair would or would not perform. After the pair agreed on a "master-slave" relationship, Mr. H directed the victim to perform what can only be described as disgusting acts. He also directed her to create child pornography of herself and distribute it to him. After the victim claimed her parents were going to sell her into sexual slavery, Mr. H traveled to Georgia, where the victim was already above the age of consent, and brought her to his home in Florida.

What followed was horrific and will not be repeated in any detail here. It suffices to say that Mr. H made the victim his "slave" in a number of ways, not all of which were sexual, and all of which were highly degrading to her. He also possessed and showed the victim child pornography, including the violent rape of a baby. The

incident ended when police found the victim running down a highway, scared, crying, and likely pregnant. The probation office recommended the "extreme conduct" upward departure may have been applicable. Mr. H pled guilty.

In mitigation, Mr. H highlighted the consensual nature of the relationship and BDSM generally, and that the sexual acts would have been lawful in Georgia. He also pointed to his military service, work history, and education. He had no criminal history. In allocution, he explained that he was remorseful but that he truly believed he loved the victim, and that she loved him. This Court sentenced him to **228 months' imprisonment.**

Mr. C.

Mr. C was 22 when he met his victim on an online dating platform. The victim misrepresented herself as an adult, though she was in fact 14. Mr. C initially believed that she was an adult, but eventually learned of her true age. Nonetheless, he pursued sex with the victim. The pair chatted online over several weeks, and Mr. C convinced the victim to create child erotica and child pornography, and to distribute it to him. He invited her to his apartment, where he had sex with her. Mr. C later bragged online about having sex with the victim and distributed the child pornography she had created for him. A search warrant of his devices revealed that he possessed a total of 12 child pornography images and one such video.

Mr. C pled guilty.  In mitigation, he pointed to his youth, his mental illness, his family support, and a risk assessment indicating a low risk of recidivism.  He also pointed to the consensual nature of the offense.  This Court sentenced Mr. C. to **168 months imprisonment.**

Several factors make these two cases usefully comparable to Mr. Pulido's.  As with Mr. H, Mr. Pulido met the victim online and engaged in a full-blown, romantic relationship with her.  Both defendants operated under the good-faith belief that they loved the victims, and that the victims loved them.  As with Mr. H, Mr. Pulido traveled to a jurisdiction where sexual activity with the victim would have been lawful, Croatia in Mr. Pulido's case and Georgia in Mr. H's.  Like in Mr. H's case, other than the age of the victim, the relationship and acts were consensual.  And while Mr. H's victim was 17 and IG was 15, Mr. H was a middle-aged man at the time of the offense, and Mr. Pulido was only 23 or 24 at the time of the offense.

But this case involves none of the sickening acts or degrading treatment that were present in Mr. H's case.  Consensual or not, what Mr. H did to his victim is dramatically different from the rather typical boyfriend-girlfriend sexual relationship Mr. Pulido had with IG.  Further, Mr. H's offense was aggravated by his production and possession of child pornography, increasing his blameworthiness (because of the additional victimization child pornography creates) and the need to protect society from him (because of the risk that he is sexually attracted to children).  Because the

nature of Mr. H's offense was much worse than Mr. Pulido's, Mr. Pulido's sentence should be lower than the 228-month sentence this Court handed down to Mr. H.

The sentencing factors more closely match Mr. C's case. Like in Mr. C's case, Mr. Pulido was in his early twenties when he met IG. Both offenses were consensual outside of the victims' age. Both defendants suffered from mental illness and have the support of their families. On one hand, there is evidence that Mr. Pulido and his father controlled IG's lines of communication to her mother and that he fled to Mexico, but, on the other hand, Mr. C's victim was younger, and he created, possessed, and distributed child pornography. Even though unlawful, Mr. Pulido's relationship with IG was always respectful and solicitous of her needs, accompanied by the good-faith belief that they were in love and would be married. Mr. C had sex with his victim once, tried to a second time, and bragged about it online. On balance, the § 3553(a) factors support a matching sentence for Mr. Pulido – and Mr. Pulido's requested sentence of 168 months is identical to Mr. C's.

**IV. This Court should not penalize Mr. Pulido for exercising constitutional rights.**

Of course, Mr. H and Mr. C pled guilty, and Mr. Pulido went to trial. But this Court should be careful to avoid penalizing Mr. Pulido for the exercise of his constitutional rights.

13

The Sentencing Guidelines handle guilty pleas under the rubric of the "acceptance of responsibility" sentencing *reduction*. *See* U.S.S.G. § 3E1.1. That is, the relevant sentencing reduction is a downward adjustment to be affirmatively earned by the defendant, with the absence of a reduction being the theoretical default position. The reduction normally does not apply to a defendant who pleads not guilty and exercises the right to a jury trial. *See id*. § 3E1.1 cmt. n.2. The Commission states that the reduction "recognizes important societal interests," without specifying the interests recognized. *See id.* (Background). A contemporary publication from a commissioner suggests the Commission's purpose was to merely cement past practice and encourage guilty pleas. *See* William W. Wilkins Jr., 23 Wake Forest L. Rev. 181, 190-92 (1988). Older cases suggest a rationale that one who has accepted responsibility will be more quickly rehabilitated by the prison system, *see Brady v. United States*, 397 U.S. 742, 753 (1969), but Congress has since decided that imprisonment should not be used to rehabilitate at all, *see Tapia v. United States*, 564 U.S. 319 (2011).

In any event, at a certain point, a reduction for acceptance of responsibility ceases to be a *reduction* and becomes a *penalty* for going to trial, and an effort to encourage guilty pleas in fact is an effort to discourage the exercise of constitutional rights. Fewer than 3% of federal defendants go to trial. National Association of Criminal Defense Lawyers, *The Trial Penalty: The Sixth Amendment Right to Trial on*

*the Verge of Extinction and How to Save It* 14 (2018).  Because the Guidelines are structured such that almost all defendants who plead guilty receive a reduction and almost all defendants who go to trial do not, it follows that only the 3% of defendants who exercise their bedrock constitutional right to a jury trial do not receive the reduction.

This Court should be careful to avoid imposing a trial penalty in this case. Mr. Pulido does not request a downward adjustment to which he is not entitled.  But at the same time, this Court should not consider his request for a variance unfavorably or choose a higher sentence from within a range because Mr. Pulido exercised the constitutional right that, along with representative government, forms "the heart and lungs of liberty."  *See* THE REVOLUTIONARY WRITINGS OF JOHN ADAMS 55 (C. Bradley Thompson ed., 2000).  Fourteen years' imprisonment is an appropriate sentence based on the nature of the offense and Mr. Pulido's history and characteristics.  That appropriate sentence should not be rejected because Mr. Pulido chose to have his guilt determined by a jury of his peers.

DATED this 18th day of February 2022.

Respectfully submitted,

A. FITZGERALD HALL, ESQ.
FEDERAL DEFENDER

/s *Samuel E. Landes*
Samuel E. Landes
D.C. Bar No. 1552625
Assistant Federal Defender
400 North Tampa Street
Suite 2700
Tampa, Florida 33602
Telephone: (813) 228-2715
Facsimile: (813) 228-2562
Email: Samuel_Landes@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th of February 2022, a true and correct copy of the foregoing was filed with the Clerk of the Court using the CM/ECF system, which will send a notice of the electronic filing to:

AUSA Lisa Thelwell.

/s *Samuel E. Landes*
Samuel E. Landes, Esq.
Assistant Federal Defender

# Valerie R. McClain, Psy.D.

**Licensed Psychologist #PY0005178**
P.O. Box 260878, Tampa, FL 35685-0878
Pager: (727) 508-4298
Email: vraemac@aol.com

FORENSIC PSYCHOLOGICAL EVALUATION

NAME: Jordan Jysae Pulido
AGE: 27
DOB:  05/06/94
DATE OF EVALUATION: 07/09/21
PLACE OF EVALUATION: Video Visit

## REFERRAL

The defendant was referred for a confidential psychological evaluation to assess mitigating factors for sentencing.  He was referred by his attorney, Samuel Landes, Assistant Federal Defender in the Middle District of Florida, Tampa, Florida (Case No. 8:20-cr-292-T-33CPT).

## TESTS AND PROCEDURES ADMINISTERED

1. Clinical Interview
2. Review of documents including charging documents
3. Mental Status Exam
4. Gilliam Autism Rating Scale – 3 (GARS – 3)

## HISTORY AND BACKGROUND INFORMATION

Records indicate that the defendant has been charged with Enticement and coercion of a minor traveling out of the country to engage in illicit sexual conduct, and transporting a minor into the country.  There were no indications of any prior criminal charges.  Mr. Pulido reported that he has hypertension and that he suffers from migraines which impact his vision. Mr. Pulido dened any prior psychiatric treatment or medication but indicated that he was Baker Acted when he was 12 years old. He denied any significant substance abuse issues.

Mr. Pulido is not married and has no children. He was born and raised in Kansas City, Kansas, moved to Georgia and then came to Florida in 2002. He reported that he was raised by both of his parents.  He has five brothers.  He denied any history of sexual abuse. He reported an incident in which he was assaulted in third grade and more recently was assaulated by other inmates while showering during his incarceration. He denied any family history of mental illness or substance abuse.

Mr. Pulido dropped out of school in the 6th grade and was then home schooled. He does not have a GED. He reported that while in school, he was a below average student in regular classes who failed two grades. He reported an incident in elementary school during the third grade in which he was assaulted and beaten up by an older classmate. He acknowledged difficulty in school with inattention and social anxiety. He reported that he has worked for Fed Ex and for the Laser Spine Institute. He does not receive Social Security Disability payments.

MENTAL STATUS AND BEHAVIORAL OBSERVATIONS

Mr. Pulido is a 27-year-old Caucasian male who was seen in a video visit. He was oriented to person, place, purpose and time. His thought processes were clear, logical and goal directed. Speech and language were within normal limits. He denied any history of auditory or visual hallucinations, as well as any paranoid ideation. He denied any history of suicidal or homicidal ideation, intent or plan. He reported that his appetite is good but his sleep is marked by nightmares and flashbacks to being assaulted in grade school and more recently was assaulted during his incarceration. He reported a history of social anxiety and panic episodes including shortness of breath, sweaty palms and feelings of the worst happening. Based on observations during this interview and his academic and vocational background, his estimated intelligence level is likely in the low average range. Results from this evaluation can be viewed as a valid indicator of his current level of functioning.

TEST RESULTS

The GARS-3 assesses difficulties in six areas including Restricted/Repetitive Behaviors, Social Interaction, Social Communication, Emotional Responses, Cognitive Style, and Maladaptive Speech. Ms. Pulido showed difficulties in all six areas.

Ms. Pulido showed difficulties on 6 items in Restricted/Repetitive Behaviors including if left alone, the majority of his/her behavior will be spent in repetitive or stereotyped behaviors, is preoccupied with specific stimuli that are abnormal in intensity, stares at hands, objects or items in the environment for at least 5 seconds, makes rapid lunging, darting movements when moving from place to place, show unusual interest in sensory aspects of play materials, body parts, or objects, and displays ritualistic or compulsive behaviors.

Ms. Pulido showed difficulties on 5 items in Social Interaction including pays little attention to what peers are doing, seems indifferent to other person's attention, shows minimal expressed pleasure when interacting with others, shows minimal or no response when others attempt to interact with her, and displays little or no reciprocal communication.

Ms. Pulido showed difficulties on 3 items in Social Communication including has difficulty understand what causes people to dislike him, fails to predict possible outcomes

of social events, and doesn't seem to understand that the other person doesn't know something.

Ms. Pulido showed difficulty on 4 items in Emotional Responses including becomes frustrated quickly when she cannot do something, responds negatively when given commands, requests or direction, shows temper tantrums when he doesn't get his way, and shows temper tantrums when told to stop doing something he enjoys doing.

Ms. Pulido show difficulties on 4 items in Cognitive Style including talks about a single subject excessively, shows superior knowledge or skill in specific subjects, shows intense, obsessive interest in specific intellectual subjects, and makes naïve remarks.

Ms. Pulido showed difficulties on 3 items in Maladaptive Speech including repeats (or echoes) words or phrases verbally or with signs, repeats words out of context, and speech is abnormal in tone, volume or rate.

These difficulties are consistent with the diagnosis of Autism Spectrum Disorder.

DIAGNOSTIC IMPRESSIONS

       Generalized Anxiety Disorder - 300.02
       Posttraumatic Stress Disorder - 309.81
       Autism Spectrum Disorder - 299

SUMMARY AND RECOMMENDATIONS

Jordan J. Pulido is a 27-year-old Caucasian male who was referred for a confidential psychological evaluation assess mitigating factors for sentencing. Mitigating factors include a history of mental health problems for which he has had no treatment including symptoms consistent with Anxiety, Posttraumatic Stress Disorder and Autism Spectrum Disorder. He has never had the benefits of psychiatric medication. He is amenable to treatment and remorseful regarding his actions. Pending the outcome of his case, it is recommended that he participate in mental health treatment to include counseling focused on establishing appropriate interpersonal skills and sexual boundaries, building coping skills to decrease his anxiety and medication management.

Thank you for referring this client to me for psychological evaluation.

Valerie R. McClain, Psy.D.
Licensed Psychologist