UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                  Case No.: 8:20-cr-292-VMC-CPT

JORDAN JYSAE PULIDO and
ROBERTO SANTANA JIMENEZ
_____/

**ORDER**

This matter comes before the Court pursuant to a Motion for New Trial filed by Defendants Jordan Jysae Pulido and Roberto Santana Jimenez, filed on November 10, 2021.[1] (Doc. # 203). The United States responded on December 17, 2021. (Doc. # 227). This Order will also address Jimenez's Motion for Mistrial, which he raised orally at trial and upon which the Court thereafter accepted written briefs. (Doc. ## 183, 222, 228). For the reasons that follow, both Motions are denied.

I. **Background**

On September 24, 2020, the government filed an indictment against Pulido and Jimenez stemming from Pulido's relationship with a 15-year-old girl, I.G. (Doc. # 1).

---

[1] Pulido filed a motion to join in his co-defendant's motion for new trial, which the government did not oppose, and the Court granted. (Doc. ## 223, 226).

1

Specifically, the indictment charged Pulido with: (1) enticement and coercion of a minor, in violation of 18 U.S.C. § 2422(b) (Count One); (2) travel with intent to engage in illicit sexual conduct, in violation of 18 U.S.C. § 2423(b) (Count Two); (3) conspiracy to transport a minor with intent to engage in sexual activity, in violation of 18 U.S.C. §§ 2423(a) and (e) (Count Three); and (4) transportation of a minor with intent to engage in sexual activity, in violation of 18 U.S.C. § 2423(a). (Id.). Jimenez, who is Pulido's father, was charged in Count Three of the indictment with conspiracy to transport a minor with intent to engage in sexual activity. (Id. at 2-3).

Before trial, each of the Defendants filed motions in limine. Jimenez's motion argued that his status as an illegal immigrant should be excluded as irrelevant and prejudicial. (Doc. # 124). The government filed a written response, representing that it did not oppose Jimenez's motion in limine, and it agreed "that whether defendant Jimenez is lawfully in the United States is irrelevant to the crimes charged and [the United States] does not intend to admit such evidence in its case-in-chief." (Doc. # 137).

Pulido also filed a pretrial motion in limine, arguing that any evidence of I.G.'s sexual history, including her

status as a virgin prior to meeting Pulido, should be excluded pursuant to Federal Rule of Evidence 412. (Doc. # 126). After soliciting a written response from the government, the Court denied Pulido's motion during the trial, concluding that there were no Eleventh Circuit cases directly on point and, reading the language of Rule 412 in light of its stated purpose, the Rule should not be used as a tool by the perpetrator of sexual misconduct to silence the victim of the misconduct. (Doc. # 215 at 96-99).

The Court conducted a jury trial in this case from October 18, 2021, until October 28, 2021. Due to circumstances described more fully below, during the presentation of the government's case in chief, Jimenez's counsel moved for a mistrial. (Doc. # 183). The Court reserved ruling on the motion for mistrial. (Doc. # 184). During trial, both Defendants also made oral motions for a judgment of acquittal, which the Court denied. (Doc. ## 179-181).

On October 28, 2021, the jury convicted both Defendants on all counts. (Doc. ## 195, 196). Both Defendants now move for a new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. ## 203, 226). The Court also received supplemental briefing on Jimenez's oral motion for mistrial. (Doc. ## 222,

3

228). Both Motions have been fully briefed and are now ripe for review.

## II.  Legal Standard

Under Federal Rule of Criminal Procedure 33(b)(2), the court is empowered to grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33. Outside the context of claimed newly discovered evidence, this standard is broad, and the decision to grant a new trial is within the sound discretion of the trial court. United States v. Martinez, 763 F.2d 1297, 1312 (11th Cir. 1985). "If the court concludes that . . . the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury." Id. (internal quotation marks omitted). The court may follow this course even if the evidence is legally sufficient to sustain the verdict. Id. Similarly, the trial court may grant a motion for new trial even where the defect does not constitute reversible error, or even legal error at all. United States v. Vicaria, 12 F.3d 195, 198 (11th Cir. 1994).

However, "[m]otions for new trial are disfavored," and the Eleventh Circuit has "directed that district courts grant them only in those really exceptional cases, when [t]he

4

evidence . . . preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." United States v. Lopez, 652 F. App'x 891, 898 (11th Cir. 2014) (internal quotation marks omitted).

Likewise, it is within the sound discretion of the trial court to decide whether to grant a motion for mistrial since the trial judge is in "the best position to evaluate the prejudicial effect of a statement or evidence on the jury." United States v. Blakely, 960 F.2d 996, 1000 (11th Cir. 1992). Mistrial is appropriate when a defendant's substantial rights are prejudicially affected. United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009). "This occurs when there is a reasonable probability that, but for the [prejudicial] remarks, the outcome of the trial would have been different." Id.

"[P]rejudicial testimony will not mandate a mistrial when there is significant evidence of guilt which reduces the likelihood that the otherwise improper testimony had a substantial impact on the verdict of the jury." United States v. Anderson, 782 F.2d 908, 816 (11th Cir. 1986). Further, "[w]hen a curative instruction has been given to address some improper and prejudicial evidence," a new trial is appropriate only if the evidence "is so highly prejudicial as

5

to be incurable by the trial court's admonition." United States v. Harriston, 329 F.3d 779, 787, n.4 (11th Cir. 2003) (citing United States v. Funt, 896 F.2d 1288, 1295 (11th Cir. 1990)).

**III. Analysis**

    **A.   Trial Evidence**

The trial evidence established that, in 2017, then 23-year-old Pulido (who lived in Florida) met then 14-year-old I.G. (who lived in Croatia) on the Internet. I.G. asked Pulido to give her guitar lessons over the Internet, and he agreed. From there, their relationship progressed to a romantic one. The government presented multiple text messages and other electronic communications between Pulido and I.G. in which they professed their love for each other and, as the months passed, the communications became increasingly sexual.

During her testimony, I.G. stated that she and Pulido would engage in "pillow talk," in which the two would masturbate over video chat. They engaged in text messages using sexual innuendos and suggestive emojis. Pulido also gave I.G. gifts, including flowers and jewelry, and he also gave gifts to I.G.'s mother and sister.

6

The evidence established that, in June 2018, Pulido traveled to Croatia and stayed with I.G.'s family for a period of weeks. I.G. testified that she and Pulido had sex for the first time on June 16, 2018 – her 15th birthday. While in Croatia, Pulido proposed marriage to I.G., and the two continued to have sex. Later that summer, I.G. and some members of her family traveled back to Florida with I.G. and Pulido and stayed at the Defendants' home. There, according to the testimony, I.G. and Pulido continued to have sex. In August 2018, I.G.'s family left to return to Croatia, but I.G. did not join them. In the following days, however, after receiving a text message from her daughter, I.G.'s mother contacted the authorities, who removed I.G. from the Defendants' home. Further, there was evidence presented at trial that Jimenez knew of and encouraged the sexual relationship between Pulido and I.G. and that Jimenez arranged for I.G.'s family to travel to Florida.

### B. Motion for New Trial

Defendants assert that a new trial is warranted for three reasons. First, Defendants take issue with the "procedure surrounding the use of a Croatian interpreter who failed to follow standard procedure during the translation of Branka Gregorin's testimony." (Doc. # 203 at 1). Second, Defendants

claim that the government intentionally elicited testimony from the victim, I.G., regarding her sexual inexperience or chastity. (Id.). Finally, the Defendants point to certain inappropriate testimony given by a witness for the government about Jimenez's immigration status. (Id. at 1-2). The Court will address each in turn.

### 1. The Croatian Interpreter

During trial, the Croatian interpreter, Davor Zivodec, was used with one witness – I.G.'s mother, Branka Gregorin. As Defendants describe in their Motion:

> When her testimony began, Ms. Gregorin initially listened to the questions from Assistant United States Attorney Lisa Thelwell in English and did her best to respond in kind. She would occasionally need to speak Croatian to get a point across. When Croatian was being spoken, Mr. Zivodec would simply translate Ms. Gregorin's words back to English. Undersigned counsel objected to this as improper method of interpretation and asked the Court to instruct Ms. Gregorin to allow Mr. Zivodec to translate the question as well as her answer for the court. The Court agreed that this method of translation was improper and issued the requested instruction.

(Doc. # 203 at 2).

The general standard for adequate translation of trial proceedings requires "continuous word for word translation of everything related to the trial." United States v. Gomez, 908 F.2d 809, 811 (11th Cir. 1990). A conviction will stand,

however, unless an interpreter's conduct rendered the entire trial fundamentally unfair in light of all the evidence. Id. Defendants have not made that showing.

Here, Ms. Gregorin initially requested that interpretation be used on an as-needed basis, as she spoke and understood some English, and the Court permitted this. (Doc. # 216 at 159). However, at one point shortly after the direct examination began, the following occurred:

> Q. So they met online, right?
>
> A. Uh-huh. (In English.)
>
> Q. What did you understand their relationship to be at the time that you learned about him?
>
> A. They just like -- (Conferring with interpreter) They just knew each other from Internet. In this time they were not still good friends.
>
> THE COURT: Hold on one second. Remember, it's better for our procedure to just give your answer in Croatian because I need to make certain I'm preserving the integrity of your answers, and so that's why we do it that way. So it's better to just give your answer in Croatian. Let the translator translate it into English[.]

(Id. at 163-64).

Afterwards, there was a period of time in which the prosecutor would ask Ms. Gregorin questions in English, and

9

she would sometimes answer in English and would sometimes answer through the interpreter. (Id. at 164-74). The Court called a recess and, during the recess, counsel for Jimenez lodged an objection, which the Court sustained. (Id. at 174-75). After ascertaining that the witness had understood all of the past questions put to her in English, the parties agreed and the Court ordered that all further questions and answers were to be posed to Ms. Gregorin through the translator. (Id. at 175-80, 182).

As pointed out by the government, Ms. Gregorin testified for approximately four and a half hours. Only the first 27 minutes of her testimony was given in English, while the remainder was given in simultaneous translation through the use of a certified court interpreter. Moreover, the context of Ms. Gregorin's answers during those 27 minutes suggests that she did understand the questions posed to her. After careful consideration, the Court does not believe that any deficiencies in the translation or the failure to use simultaneous translation for the first 27 minutes of Ms. Gregorin's testimony rendered the entire trial fundamentally unfair in light of all the evidence presented against Pulido and Jimenez.

2. <u>Evidence pertaining to I.G.'s chastity</u>

The Court now turns to Defendants' argument that a new trial is warranted due to the government's eliciting of testimony demonstrating I.G.'s chastity, status as a virgin, and/or sexual inexperience. As explained before, the Court denied Pulido's pretrial motion in limine on this issue, believing that Federal Rule of Evidence 412 did not apply to exclude this type of evidence.

Evidence of I.G.'s sexual inexperience did arise several times during the course of trial. For example, the government elicited testimony from I.G. that she had never kissed a boy before meeting Pulido, that she "had never had sex with anyone" before Pulido, and that she did not engage in sexual activity with anyone else while she was involved with Pulido. (Doc. # 214 at 24, 45; Doc. # 215 at 90).

Federal Rule of Evidence 412 provides in pertinent part:

**(a) Prohibited Uses.** The following evidence is not admissible in a civil or criminal proceeding involving alleged sexual misconduct:

    (1) evidence offered to prove that a victim engaged in other sexual behavior; or
    (2) evidence offered to prove a victim's sexual predisposition.

**(b) Exceptions.**
    (1) Criminal Cases. The court may admit the following evidence in a criminal case:

11

> (A) evidence of specific instances of a victim's sexual behavior, if offered to prove that someone other than the defendant was the source of semen, injury, or other physical evidence;
> (B) evidence of specific instances of a victim's sexual behavior with respect to the person accused of the sexual misconduct, if offered by the defendant to prove consent or if offered by the prosecutor; and
> (C) evidence whose exclusion would violate the defendant's constitutional rights.

Fed. R. Evid. 412. According to the advisory committee notes for the 1994 amendments, it was amended to "expand the protection afforded alleged victims of sexual misconduct." The advisory committee notes explain that:

> The rule aims to safeguard the alleged victim against the invasion of privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure of intimate sexual details and the infusion of sexual innuendo into the factfinding process. By affording victims protection in most instances, the rule also encourages victims of sexual misconduct to institute and to participate in legal proceedings against alleged offenders. . . .
>
> The rule has been amended to also exclude all other evidence relating to an alleged victim of sexual misconduct that is offered to prove a sexual predisposition. This amendment is designed to exclude evidence that does not directly refer to sexual activities or thoughts but that the proponent believes may have a sexual connotation for the factfinder. Admission of such evidence would contravene Rule 412's objectives of shielding the alleged victim from potential embarrassment and

> safeguarding the victim against stereotypical thinking. Consequently, unless the (b)(2) exception is satisfied, evidence such as that relating to the alleged victim's mode of dress, speech, or lifestyle will not be admissible.

Fed. R. Evid. 412, advisory committee notes.

As the Court explained during trial, it finds persuasive a district court case which rejected an argument similar to the one made by Pulido. See D.C. v. Hasratian, No. 1:14-cv-175-JNP-EJF, 2018 WL 587865, at *1 (D. Utah Jan. 26, 2018) ("Reading the language of Rule 412 in light of [its stated] purpose, the court concludes that Rule 412 cannot be used as a sword by the perpetrator of sexual misconduct to silence the victim of the misconduct."). The Hasratian court focused on the phrase "victim's sexual predisposition" in Rule 412 – the category Pulido claims this evidence falls into – and held that it is "ambiguous" as to whether this phrase would include a victim's virginity. Id. ("The phrase 'victim's sexual predisposition' can be read to mean the victim's predisposition to engage in sexual activity. It can also be interpreted to mean the victim's predisposition regarding sex. The latter construction is broad enough to include evidence of both a predisposition toward sexual activity and a predisposition not to engage in sexual activity – i.e.,

13

virginity."). After canvassing those rules, the court determined that:

> Thus the purpose of Rule 412 in general, and subdivision (a)(2) in particular, is clear. The rule is meant to protect the alleged victim from cross-examination on subjects of questionable relevance, including past sexual behavior and sexual predisposition, such as "mode of dress, speech, or life-style." Defendants, however, seek a reading of the phrase "sexual predisposition" that would run counter to this purpose. They interpret Rule 412 as permitting the alleged perpetrator of sexual misconduct to use the rule offensively to silence the alleged victim and prevent him from producing relevant evidence regarding his virginity at the time of the sexual misconduct, which relates to the issue of damages. . . . But courts will not lightly assume that ambiguous language in a rule of evidence means anything so inconsistent with the Rule's underlying theory.

Id. at *2 (internal citations, alterations, and quotation marks omitted).

In the absence of binding authority on the issue, the Court looks to the advisory committee notes that accompany Rule 412 and the persuasive reasoning of Hasratian and holds that evidence of I.G.'s chastity or sexual inexperience was not inadmissible under Rule 412.

Moreover, the gravamen of the charges in this case centered around Pulido having sex with a child who was 15 years old and Jimenez's participation in the conspiracy to transport I.G. to Florida so that Pulido could continue having

14

sex with her. This evidence was probative of Pulido's enticement or coercion of I.G. to engage in illicit sexual activity. What's more, in light of the evidence as a whole, the Court does not believe that the probative value of the evidence elicited by the government on this point was substantially outweighed by the danger of unfair prejudice to Defendants. Accordingly, the testimony elicited by the government about I.G.'s sexual inexperience prior to meeting Pulido does not warrant a new trial.

   3. <u>Testimony on Jimenez's immigration status</u>

  At trial, the government presented the testimony of Tavey Garcia, a special agent with the U.S. Department of Homeland Security, who worked as an investigator on the case. Garcia testified that, as part of her investigation, she ran an "I-9 inspection" at the Laser Spine Institute, which was Jimenez's place of work, and that she also ran a "wage and hour report" on Jimenez. (Doc. # 222-1 at 76). Jimenez's counsel asked for a sidebar and expressed his concern that the government was trying to elicit testimony about Jimenez's immigration status. (<u>Id.</u> at 77). The government represented that it was only trying to "prove that he's not a doctor like [he] has been portrayed throughout the whole trial." (<u>Id.</u>). The following then occurred:

15

> Q. Agent Garcia, as a result of your investigation, were you able to determine whether or not Mr. Jimenez was a doctor?
>
> A. I was. I was, yes.
>
> Q. What was the result of your investigation?
>
> A. Based on our investigation, we determined that Mr. Jimenez entered the United States legally in the '80s, but he remained in the United States –
>
> MR. McDERMOTT: Your Honor, I'm going to object.
>
> THE COURT: Sustained. That is stricken from the record, and the jury should completely disregard it. You need to answer the question that she asked you.
>
> Q. The question is very specific. The question is, based on your investigation, did you determine whether or not Dr. Jimenez – or excuse me – Mr. Jimenez was a doctor?
>
> A. He is not.

(Id. at 78-79).

Due to this testimony from Garcia, Jimenez's counsel moved for a mistrial. (Id. at 105). The Court reserved ruling on the motion for mistrial. (Doc. # 184).

For the reasons explained more fully below in addressing Jimenez's motion for mistrial, the Court does not believe that this lone comment necessitates a new trial.[2]

---

[2] While Defendants rely on Sanchez v. Davis, 888 F.3d 746 (5th Cir. 2018), to support their claim, Sanchez is distinguishable. In that case, there was a jury note evidencing that improper testimony about Sanchez's unlawful

In sum, Defendants have not demonstrated that the evidence preponderates so heavily against the verdicts that it would be a miscarriage of justice to let the verdicts stand. The Court has considered these alleged errors both singularly and as a whole in determining whether a new trial is warranted in this case. See United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir. 1995) (stating that "the cumulative effect of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible"). The Court concludes that, even considering the cumulative effect of the alleged errors discussed in Defendants' Motion, a new trial is not warranted. In light of the evidence presented as a whole, the Court cannot say that this is one of those "really exceptional cases" in which letting the jury's verdict stand would be a miscarriage of justice. See Lopez, 652 F. App'x at 898. Accordingly, the Motion for a New Trial must be denied.

C. **Motion for Mistrial**

Jimenez argues that, but for Agent Garcia's improper testimony about his immigration status (described above),

---

status was on the jury's mind. There is no such evidence in this case.

there is a reasonable probability that the result of his trial would have been different. (Doc. # 222 at 6). Further, he requests that, as in the Motion for New Trial, this testimony be considered in light of and in addition to the admitted testimony regarding the victims' chastity and the interpreter issue. (Id. at 6-7).

The Court finds the Eleventh Circuit's opinion in Emmanuel instructive. In that case, testimony was elicited that the defendant was out on bail at the time of the charged offense. 565 F.3d at 1334. The Eleventh Circuit held that where a lone prejudicial comment is "brief, unelicited, and unresponsive, adding nothing to the government's case, the denial of a mistrial is proper." Id.

Here, likewise, Agent Garcia's stray comment, though regrettable, was unelicited and unresponsive. In addition, the Court immediately gave the jury a curative instruction. See United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002) ("When a district court gives a curative instruction, the reviewing court reverses only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." (internal quotation marks omitted)).

What's more, in light of the substantial evidence against Jimenez – including the testimony of I.G., the text

messages sent and received by Jimenez, the travel documents pertaining to Jimenez's arrangement of I.G.'s travel to the United States, and Jimenez's knowledge that I.G. was engaging in sexual activity with his son – the Court finds it unlikely that, but for this one reference to Jimenez's immigration status, the outcome of the trial would have been different. See Anderson, 782 F.2d at 816.

Finally, for the reasons explained above, even viewing this alleged error in conjunction with the other alleged errors that occurred at trial, a mistrial is not warranted. Jimenez's Motion for Mistrial is denied.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The Motion for New Trial (Doc. # 203) is **DENIED** as to both Defendants.

(2) Defendant Jimenez's Motion for Mistrial (Doc. # 183) is also **DENIED.**

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 23rd day of February, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE